UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID KRAUS,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )
                                      )  Case No. 10 C 7132
ERIC SHINSEKI, Secretary, U.S.        )
Department of Veterans Affairs,       )  Judge John W. Darrah
                                      )
            Defendant.                )

## MEMORANDUM OPINION AND ORDER

On November 4, 2010, Plaintiff David Kraus filed a Complaint against

Defendant, Eric Shinseki, the Secretary of the Department of Veterans Affairs ("VA"),

alleging discrimination in violation of 29 U.S.C. § 791, *et seq.* ("Rehabilitation Act");

retaliation in violation of the Rehabilitation Act; and retaliation in violation of 42 U.S.C.

§ 2000e, *et. seq.* ("Title VII"). Before the Court is the VA's Motion for Summary

Judgment.

## BACKGROUND

The following facts are taken from the Parties' statements of undisputed material

facts submitted in accordance with Local Rule 56.1.[1]

_____

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to
provide "a statement of material facts as to which the moving party contends there is no
genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each
factual statement proffered by the moving party and to concisely designate any material
facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*,
403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its
opponent's statement in the manner required by Local Rule 56.1 results in those facts'
being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d
680, 683 (7th Cir. 2003). Furthermore, Local Rule 56.1(b)(3)(C) allows the nonmoving
party to file no more than forty separately numbered statements of additional facts, and

David Kraus began working for the North Chicago VA Medical Center as a Psychology Technician on May 30, 1995. (Def.'s 56.1(a)(3) ¶ 1.) At all relevant times, Kraus was employed as a Psychology Technician. (Pl.'s 56.1(b)(3)(C) ¶ 2.)

As a Psychology Technician, Kraus was responsible for providing assessment, treatment recommendations, and treatment to patients who, in addition to having a substance-abuse problem, may also have had a psychiatric or medical condition. (Def.'s 56.1(a)(3) ¶ 2.) Kraus worked in several divisions of the VA's Department of Mental Health under various supervisors. (*Id.* ¶ 1.) From 2006 through 2009, Kraus began working in the "Icarus" Program, a long-term residential substance-abuse treatment program. (Pl.'s 56.1(b)(3)(C) ¶ 2.) The Icarus Program was a ninety-day inpatient substance-abuse/mental health program with an emphasis on recovery that was developed in the 1960s. (Def.'s 56.1(a)(3) ¶ 4.)

Kraus was hired by Dr. Ronald Braasch. (*Id.*) Since about 1981, Braasch was the Section Chief of the Addiction Treatment Program in the Department of Mental Health. (*Id.* ¶ 3.) In January 2006, Braasch was assigned the additional duty of directing the Icarus program. (*Id.*) Braasch reported to Dr. Bernard Blom, the Associate Chief of the Department of Mental Health. (*Id.*) Dr. Blom reported to the Chief of the Department, Dr. Chowdary Jampala. (*Id.*) The VA's Director is Patrick Sullivan. (*Id.*) Kraus reported to Braasch. (*Id.*) Al Holt was an addiction counselor in the Icarus Program. (*Id.* ¶ 13.)

---

the moving party may submit a concise reply under Local Rule 56.1(a)(3). Failing to comply with this Local Rule, Kraus has filed forty-seven paragraphs of additional facts without leave of Court.

In 2006, the Joint Commission on Accreditation of Healthcare Organizations found the Icarus Program to be deficient, and the VA began to phase out the Icarus Program.[2] (*Id.* ¶ 4.) Thereafter, the VA began efforts to educate and train the staff toward a different treatment model. (*Id.* ¶ 5.)

On October 25, 2006, Kraus and five other health care professionals assigned to work in the substance-abuse treatment program sent a petition to the Union President, James Charleston, criticizing Braasch's lack of supervision and oversight of the Icarus Program. (Pl.'s 56.1(b)(3)(C) ¶ 5.)

The petition was sent to Braasch's "boss," and a meeting was convened with the Union President concerning the allegations raised against Braasch. (*Id.*) Braasch was aware of the petition from conversations he had with Ron Thomas, a Domiciliary Assistant, Blom and Kraus. (*Id.*)

Approximately two weeks after the petition was signed, Braasch advised Jampala that he, Braasch, intended to consult with the Human Resource Department "to gather information and complete conduct related packets relative to various employees." (*Id.* ¶ 6.) Later, Braasch testified that he was gathering information for Human Resources about employees who engaged in specific improper behavior, including failure to

---

[2] The VA cites Kraus's and Braasch's deposition as the evidentiary support for this fact. Kraus denies this fact with no citation to the record. Local Rule 56.1(b)(3)(B) requires "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, *specific references* to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* (emphasis added). To the extent Kraus fails to support his denials of the VA's facts, these facts are deemed to be admitted. *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir.2000) (holding that the requirements for a response under L.R. 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted.").

document patient interventions.[3] (*Id.*, Ex. 2 at 36.) Braasch's employees included Holt, Kraus, John Lovsin, and Greg Mavromatis (all of whom signed the petition against Braasch), but he also testified that he documented conduct of employees who did not sign the petition. (*Id.*) Braasch denied that there was any cause and effect between the letter to the union and any potential discipline.[4] (*Id.*)

Holt began acting as the supervisor of Icarus due to his knowledge and experience of the program and because Braasch was not present in the office a majority of the time. (Pl.'s 56.1(b)(3)(C) ¶ 7.) Kraus believed that Holt was pushy, aggressive, loud and rude. (Def.'s 56.1(a)(3) ¶ 13.) Kraus found Holt intimidating and stressful and that a conflict between his supervisor (Braasch) and Holt disruptive and stressful. (*Id.*)

### Kraus's Testimony in Holt's EEOC Proceedings

On December 30, 2006, Holt filed a claim of discrimination with an EEO counselor within the VA's ORM.[5] (Pl.'s 56.1(b)(3)(C) ¶ 8.) Holt brought his claim on the basis of retaliation by Braasch, alleging that Braasch had given him an unfair

---

[3] Braasch testified in proceedings brought by Holt before the Office of Resolution Management ("ORM"), discussed below.

[4] Kraus's mischaracterization of Braasch's testimony in his statement of additional facts is careless. Kraus states that Braasch, in his testimony, "conceded the individuals for whom he was creating "conduct related packets" were limited to those who had signed the petition citing his supervisory shortcomings. (Pl.'s 56.1(b)(3)(C) ¶ 6.) Again citing Braasch's testimony, Kraus further states that "each of the employees who signed the petition were subsequently removed or reassigned from the Icarus program by Dr. Braasch." (*Id.*) However, a review of Braasch's deposition testimony completely contradicts Kraus's statement.

[5] The parties have provided the Court with no background regarding the ORM and the process of bringing an employment-discrimination complaint. According to its website, the ORM "provides EEO discrimination complaint processing services to [Department of Veterans Affairs] employees, applicants for employment, and former employees. These services include counseling, investigation, and procedural final agency decisions." U.S. Dep't of Veterans Affairs, ORM Home, http://www.va.gov/orm (last visited Dec. 9, 2011). The counselors at the ORM are referred to as EEO counselors.

performance evaluation on November 28, 2006, and also had failed to accommodate his disability. (*Id.*) The ORM dismissed the disability claim for failure to state a claim upon which relief could be granted. (*Id.*, Ex. 11 at 2.)[6]

In 2007, Holt was subject to an Administrative Investigation Board ("AIB") review.[7]

On July 11, 2007, Holt filed a second claim of discrimination with the ORM, alleging additional retaliatory actions by Braasch. (*Id.* ¶ 9.) In particular, Holt alleged Braasch had reassigned Holt and initiated the AIB review against Holt for allegedly subjecting Kraus to intimidation. (*Id.*)

The U.S. Equal Employment Opportunity Commission ("EEOC") granted summary judgment in the VA's favor on all claims in this case and Holt's December 30, 2006 case, stating, "There is simply no or very little evidence that Complainant's allegations have merit under Title VII."[8] (*Id.*, Ex. 39 at 6, 7.) The EEOC went on to say, "[t]he record however is even clearer in establishing that such actions . . . were not based on Complainant's prior protected activity or any other discriminatory basis under Title VII." (*Id.*)

---

[6] The VA discussed Holt's ORM claims in its response to Kraus's 56.1(b)(3)(C) statement, with citations to the ORM's Notice of Acceptance of Holt's case, which was submitted by Kraus. The Court may take judicial notice of reports of administrative bodies. *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *see also* Fed. R. Evid. 201.

[7] Again, the parties have provided no information regarding what an AIB is. As explained by another court, an AIB "is an investigatory panel with the power to take sworn testimony, to investigate . . . suspected patient abuse." *Kanna v. Peake*, No. 2:08 C 242, 2010 WL 2557824, at *3 (S.D. Ohio June 23, 2010).

[8] The parties do not explain why the EEOC decided a motion for summary judgment. Presumably, Holt appealed the dismissal of his complaint by the ORM to the EEOC.

5

Kraus testified during both investigations relating to Holt's claims, as well as the AIB review. (Def.'s 56.1(a)(3) ¶ 21.) On July 3, 2007, Kraus testified before the ORM in connection with Holt's first claim, that "Braasch is certainly retaliating against me for not writing up or embellishing reports on Holt and from my own experiences." (*Id.* ¶ 22, Ex. 19 at 5.)

On November 16, 2007, Kraus testified in Holt's AIB review that Braasch told him how to write the report on Holt. (*Id.*) On December 28, 2007, Kraus testified before the ORM in connection with Holt's second EEOC complaint against Braasch that Braasch did not ask him to embellish or alter his reports about Holt. (*Id.* ¶¶ 20, 22.) Kraus further testified that the conflict between Braasch and Holt created a hostile work environment, caused his blood pressure to escalate and, for such reasons, he continuously sought to transfer out of the department. (*Id.* ¶ 20.)

In his testimony to the ORM, Braasch denied any involvement regarding anyone's ORM or AIB testimony, except to allow time from work for the testimony and to tell the truth. (Def.'s 56.1(a)(3) ¶ 23.) Braasch also testified that he was not privy to anyone's testimony but his own. (*Id.*)

As a result of the AIB review, Holt was transferred permanently to another unit. (*Id.* ¶ 24.) The initial report and recommendation of the Holt AIB was sent to the Medical Director on December 14, 2007. (Pl.s 56.1(b)(3)(C) ¶ 18.) The Board recommended to "relocate David Kraus due to his medical condition." (*Id.*) A supplemental report of the AIB was sent to the Medical Director on February 25, 2008, which again recommended Kraus be relocated due to his medical condition. (*Id.* ¶ 19.)

6

*Kraus's Medical Background*

Kraus has been diagnosed with numerous medical conditions, including infantile hypoxia, hypertension, aortic regurgitation, seizure disorder, asthma, and attention deficit disorder ("ADD"). (*Id.* ¶ 8.) During his employment at the VA, Kraus was treated by his internist, Dr. Steven Schubert. (*Id.*) Schubert diagnosed Kraus as suffering from hypertension, seizure disorder, sinusitis, benign prostatic hypertrophy, thoracic aortic aneurysm, sleep apnea, asthma, aortic regurgitation, left ventricular hypertrophy, hypercholesterolemia, allergy history, hyperkalemia, Type 2 diabetes, lower extremity edema, constipation and anxiety. (Pl.s 56.1(b)(3)(C) ¶ 15.)

Schubert testified that Kraus reported he was experiencing increased stress due to interactions with his "boss" at work. (*Id.*) During his employment, and in particular during 2007-09, Kraus was treated by Howard J. Klapman, a psychiatrist. (*Id.* ¶ 17.) Kraus told Klapman that he attempted to get a transfer from the unit that Braasch supervised. (*Id.*) Klapman testified that the power struggle, Kraus's fear of Braasch, and being forced to falsify reports adversely affected Kraus's ability to work and aggravated his ADD. (*Id.*)

*Kraus's Claim*

Kraus received "fully successful" performance evaluations under Braasch's supervision during annual rating periods October 1, 2007 through September 30, 2008. (Pl.s 56.1(b)(3)(C) ¶ 12.)

In March 2007, Holt was disruptive at a staff meeting. (*Id.* ¶ 14.) Braasch documented the offensive conduct in an email to all staff present for comment. (*Id.*)

Kraus responded, agreeing with the recitation and adding additional information regarding Holt's tone, characterizing it as threatening. (*Id.*)

In March 2007, Holt complained to Braasch that Kraus was not arriving to work on time. (*Id.* ¶ 15.) Braasch examined the time records of all the employees and concluded that Kraus and others were often late to work. (*Id.*) On April 24, 2007, Braasch sent Kraus a memo, stating that a review of Kraus's attendance from January 1, 2007 through April 24, 2007, indicates that he was tardy on at least fifteen occasions. (*Id.*) In this memo, Braasch also stated that Kraus's tardiness was having a severe impact on the performance and morale of the program. (*Id.* ¶ 16.) Braasch strongly encouraged Kraus to improve his attendance and offered his support in Kraus's endeavors to do so. (*Id.*) Braasch issued a similar memo to Holt and Mavromatis on the same day. (*Id.* ¶ 17.)

In July 2007, Kraus, through an attorney, made a request for accommodation to Medical Director Sullivan. (*Id.* ¶ 18.) Kraus included 2005 medical test results and the statements of two doctors, listing his diagnoses. (*Id.*) On July 18, 2007, Kraus provided the VA with a letter from Schubert, which stated that Kraus had hypertension and aortic valve disease and that he was adjusting Kraus's medication because of a recent elevation in Kraus's blood pressure. (*Id.* ¶ 9.) On July 19, 2007, Dr. Resnick provided the VA with a letter, stating that Kraus had been diagnosed with bronchial asthma. (*Id.* ¶ 9.) Neither Schubert nor Resnick provided the VA with any other correspondence on behalf of Kraus. (*Id.*)

The VA responded in August of 2007, asking for current medical information and substantiation of his need for an accommodation. (*Id.* ¶ 19.) Kraus responded, claiming

that his "current file contain[ed] information providing sufficient notice of his disability." (*Id.*)

The VA again asked for current and complete documentation, explaining that any medical documents are kept in a confidential, separate file to which Sullivan did not have access. (*Id.* ¶ 20.) Kraus acknowledged that neither additional doctor letters nor any documents indicating a need for accommodation were provided to the VA. (*Id.*) The VA received no further communication from Kraus and consequently made no determination on this request. (*Id.*)

In 2008, VA employee Otha Evans was also the subject of an AIB investigation. (*Id.* ¶ 25.) A patient complained that Evans inappropriately touched him to wake him up. (*Id.*) Kraus testified at the Evans AIB hearing. (*Id.*) The AIB recommended that Evans receive a suspension as appropriate disciplinary action for verbal abuse. (*Id.*) It also recommended that Braasch receive supervisory training for failure to take progressive disciplinary action against Evans and further training on how to correct inappropriate conduct and on performance, which Braasch did. (*Id.*)

On December 18, 2007, Kraus received notice he would be suspended for five days for eight instances of tardiness between May 22, 2007 and September 30, 2007, and two instances of being absent without leave. (*Id.* ¶ 26.)

From 2007 to 2009, Kraus sought other positions within the VA. (*Id.*) He was interested in a position with the vocational rehabilitation unit. (*Id.*) He applied for a position in 2007, but the position was part of a station-wide hiring freeze, and it was not filled. (*Id.*)

In November of 2008, Kraus learned that the VA was participating in two recruiting events and that the VA's recruitment office was seeking volunteers. (*Id.* ¶ 29.) Kraus communicated directly with the New Orleans recruiting office and volunteered to staff both events. (*Id.*) Kraus's travel expenses would be covered by the recruiting office, and his time would be reimbursed to North Chicago VA. (*Id.*)

When Kraus then requested permission to attend the events, Braasch consulted his superiors and denied the request because it was not related to his job. (*Id.* ¶ 30.) The job fair was staffed by VA volunteers, and no vacancy announcement was posted for these fairs as it was not a full-time position. (*Id.*)

In February 2009, Kraus went to the Vocational Rehabilitation Unit and asked about job openings. (*Id.* ¶ 28.) The director of the unit (Dr. Williams) called Braasch, complaining that Kraus was disrupting the unit and soliciting patients for his treatment group.[9] (*Id.*) Kraus did not apply for the 2009 position. (*Id.*)

---

[9] Kraus denies this statement and states, citing to Braasch's deposition testimony, "Braasch conceded at his deposition that he actually 'solicited' a report from Dr. Williams in order to 'build up a file' against plaintiff." (Pl.'s 56.1(b)(3)(B) ¶ 28 (citing Braasch Dep. at 123).) Kraus mischaracterizes Braasch's testimony at those pages. Braasch testified as follows:

> A. My understanding of the situation, that he was over there about an addiction therapist position and he'd like to work there.
> Q. And who was it that you understood he was seeking to move over to? What supervisor?
> A. Okay. The supervisor over there was Eddie Williams.
> Q. Did you ask those doctors to provide affidavits to you to build Mr. Kraus's file?
> A. Yes, I did.
> Q. You did, didn't you[?] They didn't come to you. You went to them, and what did you ask them to write?
> A. Let's back up because what you're stating is not accurate.

To the extent that Kraus has mischaracterized the record in his LR 56.1(b)(3)(B) response, his response is disregarded.

During March, 2009, Braasch issued Kraus a letter of inquiry concerning his presence at the Vocational Rehabilitation Unit during the week of February 23, 2009. (Pl.'s 56.1(b)(3)(C) ¶ 33.) On March 10, 2009, Kraus responded to the letter of inquiry, in which he asserted his presence at the Unit was part of his normal scheduling duties and was non-disruptive to patients or staff. (*Id.* ¶ 34.)

On May 1, 2009, Kraus delivered a letter to Jampala regarding Kraus's desire to be transferred to a different unit. (Def.'s 56.1(a)(3) ¶ 31.) In this letter, Kraus stated that Braasch continued his "vendetta" against the signers of the October 2006 petition and that Kraus was a victim of retaliation for refusing to embellish his reports against his co-employee, Holt. (Pl.'s 56.1(b)(3)(C) ¶ 23.) Kraus further stated that Braasch was interfering with his requests to be assigned to other positions at the hospital. (Def.'s 56.1(a)(3) ¶ 31.) Kraus indicated a desire to work as a Psychometrician in another unit. (*Id.*) Kraus requested a meeting with Jampala to further present his allegations of retaliation by Braasch. (Pl.'s 56.1(b)(3)(C) ¶ 23.) Kraus stated that he met with Jampala and suggested lateral transfers without submitting an application. (Def.'s 56.1(a)(3) ¶ 32.)

In March 2009, Braasch consulted Human Resources regarding Kraus's tardiness. (*Id.* ¶ 34.) On May 7, 2009, Jampala proposed that Kraus receive a ten-day suspension for excessive tardiness (11 tardy arrivals from October 28, 2008, through March 5, 2009) and disrupting patient care in the Vocational Rehabilitation Unit. (*Id.*)

In June of 2009, while this proposal was being processed, Braasch provided additional information to Human Resources regarding Kraus's failure to cover the caseloads of co-workers who were on vacation and his mistreatment of patients.

(*Id.* ¶ 35.) Internal memos establish that a proposal to suspend plaintiff for ten days was prepared in April 2009, and issued on May 7, 2009, for instances of tardiness, inappropriate solicitation of patients for an addiction group in the VRU clinic and disruption of patient care. (*Id.* ¶ 36.) Kraus received the proposed notice of suspension on May 15, 2009. (*Id.*) Kraus responded to the notice of proposed suspension in writing, disputing the tardiness allegations and denying he solicited patients or engaged in disruptive conduct in the VRU clinic. (*Id.* ¶ 37.)

Human Resources determined there was no evidence that Kraus was improperly soliciting patients or that "he was malingering or that his actions were disruptive to patient care" but that his actions were wrongful in that he was out of his work area and that he showed poor judgment in soliciting patients. (*Id.* ¶ 38.)

The VA rescinded the notice of proposed suspension and issued a notice of proposed removal on September 21, 2009, which included a claim of patient interference and solicitation in the VRU area. (*Id.* ¶ 39.) Subsequently, Jampala rescinded the proposed suspension and combined the excessive tardiness charges with the additional misconduct, proposing Kraus's removal on October 23, 2009. (Def.'s 56.1(a)(3) ¶ 37.) Kraus was charged with one instance of unauthorized absence, twenty-one instances of unauthorized tardiness, four instances of lack of candor, one instance of failure to follow supervisory instructions, one instance of making disrespectful remarks to a patient, and one instance of soliciting patients for an addiction group and disrupting patient care. (*Id.*) Kraus's removal was effective December 31, 2009. (*Id.* ¶ 38.)

*Kraus's EEOC Proceedings*

Kraus filed a Complaint of Discrimination with the ORM on January 19, 2010.

(Pl.'s 56.1(b)(3)(C), Ex. 38.) On April 21, 2010, the EEOC sent Kraus a "Notice of

Acceptance," which stated:

> A close examination of the complaint file revealed the instant complaint
> raises an overall claim of hostile work environment with regard to the
> following events:
>
> Event 1: During 2007, to on or about December 2009, the complainant's
> continual requests for a reasonable accommodation for his disability were
> not recorded, processed, or referred for consideration to the facility's
> reasonable accommodation committee.
>
> Event 2: After the complainant engaged in prior EEO activity during
> 2007-2008, on numerous occasions, his supervisor, Braasch (Dr. B),
> falsely accused him of being AWOL and [of] misconduct on numerous
> occasions.
>
> Event 3: After the complainant engaged in prior EEO activity in 2007-
> 2008, Dr. B solicited others to file false[,] misleading reports of contact
> against him.
>
> Event 4: Effective December 3, 2010, the complainant was removed from
> his position of Psychology Technician, GS-181-7.

(*Id.*, Ex. 38A.)

On June 13, 2011, Kraus sat for a deposition in his ORM case, filed

January 19, 2010. (Pl.'s 56.1(b)(3)(C) ¶ 21.) Kraus testified that his former testimony

before the ORM on December 28, 2007, that Braasch did *not* ask him to embellish or

alter his reports about Holt, was false. (*Id.* ¶ 22.) Kraus further testified that he regularly

requested reassignment out of the unit because the "atmosphere of constant fighting . . . ,

and threats" made it impossible to focus on his job responsibilities and because it

increased his blood pressure and caused harm to his cardiac condition. (*Id.* ¶ 22.)

In his June 2011 testimony in the January 19, 2010 ORM case, Braasch testified that Kraus had advised him that he was requesting a transfer due to stress and that Kraus advised him about his heart problems and hypertension. (Pl.'s 56.1(b)(3)(C) ¶ 24.) Braasch further testified that he spoke directly to Jampala "about David's efforts to get out of the department because of the stress and the need to be reassigned." (*Id.*) Braasch then stated that Jampala advised him, "Let's not do anything now. Let's see how things kind of play out." (*Id.*)

Jampala testified that he was aware of Kraus's request for transfer in 2007; that he discussed the 2007 accommodation request with Braasch and Dr. Blom; and that he was aware of Kraus's letter, requesting a transfer, dated May 1, 2009. (*Id.* ¶ 25.) When asked whether he did anything to process Kraus's request for transfer, Jampala stated, "I don't think we did anything with that request." (*Id.*) Jampala testified that he made no "individualized assessment" of Kraus or his requests for transfer. (*Id.*)

### VA's Reasonable Accommodation for Employees and Applicants with Disabilities Policy

The VA's "Reasonable Accommodation for Employees and Applicants with Disabilities" policy, implemented pursuant to the Rehabilitation Act of 1973, provides that "reassignment" is included within the definition of reasonable accommodation. (*Id.* ¶ 26.)

The Human Resources Specialist handling the request "should" provide the form "Request for Reasonable Accommodation." (*Id.*, Ex. 23 at 3719.) "The decision maker and the requesting individual should talk to each other to make sure that there is a full exchange of relevant information." (*Id.* at 3720.) The decision maker and

Human Resources "will be responsible for obtaining written documentation about the disability and/or functional limitations from the individual." (*Id.* at 3721.) "The supervisor in collaboration with the HR Manager may offer that the individual be examined by a physician chosen by the VA." (*Id.*) "When possible, decisions regarding accommodations should be in 20 calendar days or less." (*Id.* at 3722.) When a decision on a request for accommodation is made, the "Checklist for Determination on Qualification as a Person with Disability" must be completed and forwarded to the EEO Program Manager. (*Id.*) The written notice of denial of an accommodation "will inform the individual that s/he has the right to seek internal review of the decision by the RAC [Reasonable Accommodations Coordinator), to file an EEO complaint with the Office of Resolution Management (ORM) and may have rights to pursue MSPB [Merit Systems Protection Board] and union grievance procedures." (*Id.* at 3723.)

The Reasonable Accommodation Committee did not issue any minutes or agendas during the period 2007-2009. (*Id.* ¶ 31.)

Kraus testified that at no time was he advised of the existence of the Reasonable Accommodation Policy or the Reasonable Accommodation Committee. (*Id.* ¶ 32.) Kraus also testified that neither he nor his representatives were provided any of the forms necessary for the processing or appeal of his several requests for reasonable accommodation. (*Id.*) In addition, Kraus testified that at no time was he or his legal representatives ever advised that his requests for accommodation had either been granted or denied.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal citation omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ANALYSIS

### *Failure-to-Accommodate Claim (Count I)*

In Count I, Kraus alleges a violation of the Rehabilitation Act based on the VA's failure to accommodate Kraus's disability from 2007 through 2009. The Rehabilitation Act prohibits discrimination in the same manner as the Americans with Disabilities Act and uses the same standards but applies to employees of federally funded programs. *Coleman v. Potter*, 09 C 3824, 2010 WL 4134337, at *6 (N.D. Ill. Oct. 19, 2010). The

16

Rehabilitation Act protects a "qualified individual with a disability" from discrimination

solely because of her disability in any program receiving federal financial assistance.

*Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004) (citing 29 U.S.C. § 794(a)).

The courts look to the Americans with Disabilities Act of 1990 ("ADA"),

42 U.S.C. § 12101 *et seq.*, to determine if a violation of the Rehabilitation Act occurs in

the employment context. *Peters v. City of Mauston*, 311 F.3d 835, 842 (citing 29 U.S.C.

§ 794(d)). The ADA prohibits an employer from discriminating against an individual by

"not making reasonable accommodations to the known physical or mental limitations of

an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "To

establish a *prima facie* case for failure to accommodate under the ADA, [Kraus] must

show that: (1) [he] was disabled; (2) the [defendant] was aware of [his] disability; and

(3) [he] was a qualified individual who, with or without reasonable accommodation,

could perform the essential functions of the employment position." *McPhaul v.

Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 563 (7th Cir. 2000) (*McPhaul*). "To

survive a motion for summary judgment, a plaintiff must present the court with evidence

that, if believed by a trier of fact, would establish all three elements" of a *prima facie*

case. *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 748 (7th Cir. 2011). The ADA

defines "qualified individual" as "an individual who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such

individual holds or desires." 42 U.S.C. § 12111(8); *see Budde v. Kane Cnty. Forest

Pres.*, 597 F.3d 860, 862 (7th Cir. 2010).

As a preliminary issue, the VA argues that Kraus's Rehabilitation Act claims

based on the 2007 accommodation requests and requests for transfer in 2007 through

17

2009 are untimely because Kraus failed to file an administrative claim within forty-five days of the alleged discriminatory act. Under the Rehabilitation Act, federal employees must notify an EEO counselor of discriminatory conduct within forty-five days of its occurrence. 29 C.F.R. § 1614.105(a)(1). The requirement acts as a statute of limitations, and failure to comply with the requirement bars a federal employee from pursuing a discrimination claim under Title VII or the Rehabilitation Act. *Smith v. Potter*, 445 F.3d 1000, 1006-1007 (7th Cir. 2006); *Johnson v. Runyon*, 47 F.3d 911, 917 (7th Cir. 1995). An extension of the time limit may be available if the plaintiff shows that despite due diligence, he was prevented by circumstances beyond his control from contacting the counselor within forty-five days. 29 C.F.R. § 1614.105(a)(2).

The VA argues that Kraus made only one accommodation request in 2007; because Kraus did not contact an EEO counselor until January 2010, the VA argues that his claim is untimely. The VA further argues that Kraus's requests to be transferred, in 2007 through 2009, were not disability accommodation requests. Even if these "transfer requests" are considered disability accommodation requests, the VA argues, any claims predicated on these requests would also be untimely.

Kraus first responds that the VA admitted in its Answer that a "timely 'mixed case' complaint of discrimination" was filed with the ORM on February 25, 2010. (Dkt. No. 7, ¶ 4.) Therefore, Kraus argues, the VA waived or is estopped from asserting that Kraus failed to notify an EEO counselor within forty-five days of the act of discrimination. The VA replies that its Answer only admitted that a "mixed case" – which includes an adverse personnel action, as well as a discrimination claim – was timely. Had Kraus alleged that he filed a timely "discrimination" complaint, the VA's

18

Answer would have changed. The VA's explanation is reasonable,[10] and Kraus's argument is not persuasive.

Kraus next argues the VA has waived a statute of limitations argument because the VA failed to raise the timeliness of his claim at the administrative stage. Kraus relies upon the "Notice of Acceptance" he received on April 21, 2010, in which the ORM opined that Kraus's "continual requests for a reasonable accommodation for his disability" during 2007 to December 2009 were "acceptable for investigation as a recurring violation claim." (Pl.'s 56.1(b)(3)(C), Ex. 38A.)

Kraus's reliance on the ORM's Notice of Acceptance, however, is unpersuasive. In *Ester v. Principi*, 250 F.3d 1068, 1071-1072 (7th Cir. 2001), the Seventh Circuit held, "[W]hen an agency decides the merits of a complaint, without addressing the question of timeliness, it has waived a timeliness defense in a subsequent lawsuit." The Court of Appeals further emphasized that it was not "reject[ing] the well-settled rule that agencies do not waive a timeliness defense merely by accepting and investigating a discrimination complaint." *Id.* The VA has not yet issued a final agency decision on the merits of Kraus's case; therefore, a statute of limitations defense has not been waived by the VA.

Next, Kraus appears to argue that the continuing-violation doctrine applies. Specifically, Kraus argues that his requests in 2007 through 2009 are continuing violations that link to his December 2009 employment termination. (Resp. at 15.) The continuing-violation doctrine "is designed to 'accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the

---

[10] The VA requests in the alternative that it be permitted to amend its Answer. This is unnecessary in light of the Court's ruling on this issue.

limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered . . . timely.'" *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) (emphasis added); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000) (under continuing-violation doctrine, plaintiff may "get relief for a time-barred act by linking it with an act that is within the limitations period.").

The continuing-violation doctrine, however, does not apply to "discrete acts of discrimination that can be pinpointed to a particular day." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110-14 (2002). In *Jones v. Merchants Nat. Bank & Trust Co. of Indianapolis*, 42 F.3d 1054, 1058 (7th Cir. 1994), the Seventh Circuit discussed three different continuing violation theories. Of those, the only theory that could apply here is when a "plaintiff can show a continuing violation where an employer covertly follows a practice of discrimination over a period of time." *Id.* "In such a case, the plaintiff can only realize that she is a victim of discrimination after a series of discrete acts has occurred." *Id.*

The VA concedes that Kraus made an accommodation request in 2007 (Mot. at 9, Reply at 5); but the VA argues that the continuing-violation doctrine does not apply because Kraus's requests for transfers in 2008 through 2009 were "discrete acts." This presents disputed factual questions as to whether Kraus "knew, or 'with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him." *Id.*

Specifically, facts are disputed as to whether Kraus's 2007 request for accommodation, and continuing requests thereafter, was formally denied. With this

record, a reasonable trier of fact could conclude that Kraus did not know that his accommodation requests were denied until he was terminated in December 2010.

Therefore, the continuing-violation doctrine could apply because a reasonable juror could conclude on this record that the denial of Kraus's 2007 request for accommodation, oral requests for transfers in 2008 and 2009, and his May 1, 2009 written request were part of a "pattern or policy of discrimination" that eventually resulted in his December 2010 termination. Accordingly, the VA's Motion for Summary Judgment on the basis that Kraus's Rehabilitation Act claim is time-barred is denied.

Turning to the merits of Kraus's claim, the VA argues that Kraus fails to establish a *prima facie* case for failure to accommodate because he has not shown he was disabled. *See* 42 U.S.C. § 12112(b)(5)(A) (prohibiting an employer from discriminating against an individual by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.").

Kraus has presented evidence, which, if believed by a trier of fact, shows that he is disabled. It is undisputed that during his employment at the VA, Kraus was diagnosed as suffering from a wide range of diseases, including, among others, hypertension, seizure disorder, sleep apnea, and Type 2 diabetes. Furthermore, Kraus has presented evidence that the "atmosphere of constant fighting" between Holt and Braasch exacerbated his cardiac condition. A reasonable juror could conclude from this that Kraus was substantially limited in a major life activity.

Next, the VA argues that even if Kraus could demonstrate he is disabled, his request for accommodation was not reasonable because Kraus sought only to be transferred to a different supervisor. The VA relies on *Weiler v. Household Fin.*, 101

F.3d 519 (7th Cir. 1996) (*Weiler*), to argue that Kraus's request for a transfer was unreasonable as a matter of law. *Weiler* is factually distinguishable. In *Weiler*, the plaintiff alleged that job stress caused her to develop a temporal mandibular joint ("TMJ") disorder, and her supervisor caused her anxiety and depression by yelling at her during a review of her job performance. *Id.* at 522. The plaintiff claimed that her employer ("HFC") violated the ADA by not placing her with a different supervisor. The Court of Appeals affirmed the district court's grant of summary judgment in favor of HFC.

The district court held that HFC had *properly accommodated* the plaintiff because it "offered her reasonable accommodation, which she refused." *Id.* at 525; *see Gile v. United Airlines*, 95 F.3d 492, 499 ("Thus, when an employee requests a transfer as reasonable accommodation and the employer offers alternative reasonable accommodation, which the employee then refuses, the employer cannot be liable for failing to reasonably accommodate the employee by not transferring him to another position."). The Court of Appeals noted:

> HFC allowed Weiler the time off work she requested to attend therapy sessions for her TMJ disorder. HFC provided her with short-term disability benefits for 26 weeks. It also applied for long-term disability benefits on her behalf. It allowed her to post for a new position in the company in the same salary grade. HFC's personnel manager searched for a similar position for her in the company under a different supervisor, but none was available. HFC also granted Weiler an extended leave. HFC even contacted her and offered her alternative available positions within her salary grade and invited her to interview for them. She refused.

*Id.* at 526. Contrary to the VA's interpretation, the Court of Appeals did not hold that a plaintiff's request to be transferred to another supervisor is "unreasonable as a matter of law."

Under the ADA, a reasonable accommodation is defined in pertinent part as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). On this record, and in light of the evidence concerning Kraus's disability, a reasonable trier of fact could conclude that Kraus's continued requests for a transfer were reasonable.

The VA does not argue that Kraus has failed to establish the second and third prongs of a *prima facie* case of his Rehabilitation claim. In any event, Kraus has presented evidence that, if believed by a trier of fact, the VA was aware of his disability and that he was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position. *See McPhaul*, 226 F.3d 558, 563 (7th Cir. 2000).

### Retaliation Claim (Count II)

In Count II, Kraus alleges that the termination of his employment was in retaliation for his requests for accommodation in violation of the Rehabilitation Act. In order for Kraus to establish a claim of retaliation using the direct method of proof, under which Kraus proceeds, he must prove: (1) he is disabled within the meaning of the Rehabilitation Act; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he suffered an adverse employment action because of his disability. *Dvorak v. Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002). A plaintiff may prevail under the direct method by "construing a convincing mosaic of

circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker." *Nichols v. Southern Ill. Univ.*, 510 F.3d 772, 782 (7th Cir. 2007). Such circumstantial evidence may include "suspicious timing, ambiguous statements and patterns demonstrating differing treatment of similarly situated employees." *Id.*

The VA argues that Kraus has not established a *prima facie* case of retaliation. But as set forth above, with respect to the first and second prong, Kraus has provided sufficient evidence upon which a trier of fact could reasonably believe Kraus is disabled within the meaning of the Rehabilitation Act and that Kraus is qualified to perform the essential functions of his job with or without accommodations. With respect to the third prong, Kraus has presented circumstantial evidence that the termination of his employment was in retaliation for his requests for accommodation that is sufficient to survive the VA's Motion for Summary Judgment. Among other pieces of circumstantial evidence, Kraus has presented evidence that: Kraus made requests for accommodation in 2007 through 2009 – specifically, on May 1, 2009, Kraus sent Jampala a letter, requesting a transfer; on May 7, 2009, Jampala proposed that Kraus receive a ten-day suspension for excessive tardiness and disrupting patient care; on October 23, 2009, Jampala rescinded the proposed suspension and proposed termination of Kraus's employment; and on December 31, 2009, Kraus's removal became effective purportedly based in part on tardiness commencing more than a year before termination. From this mosaic of circumstantial evidence, a reasonable juror could conclude that the VA in fact terminated Kraus in retaliation of Kraus's requests for accommodation, in particular, his May 1, 2009 transfer request. Accordingly, the VA's Motion for Summary Judgment is denied with respect to Count II.

*Title VII Claim (Count III)*

In Count III of his Complaint, Kraus alleges that the VA terminated his employment in retaliation of Kraus's testimony in Holt's EEOC proceedings in late 2007. Although Kraus does not expressly state so, his recitation of the applicable law suggests that he proceeds under the direct method. (Resp. at 17.) Kraus also argues that he has demonstrated "pretext," which suggests that he also proceeds under the indirect method.

To make out a case of Title VII retaliation under the direct method, a plaintiff must show three things to survive summary judgment: (1) that he engaged in an activity protected by Title VII; (2) he suffered a materially adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Leonard v. Eastern Illinois University*, 606 F.3d 428, 431 (7th Cir. 2010).

The VA argues that Kraus presents no evidence of retaliation under either the direct or indirect method. With respect to the first prong, Kraus has provided evidence of "protected activity" – he bases his retaliation claim on his 2007 testimony to the EEOC in Holt's case, in which Kraus testified that Braasch told him to embellish his report regarding Holt. Under the participation clause of Title VII, employers are prohibited from retaliating against an employee who participates in any manner in an investigation, proceeding, or hearing under Title VII or assists a fellow employee in his or her Title VII action. 42 U.S.C. § 2000e-3(a).

With respect to the second prong, Kraus has presented evidence that he suffered a materially adverse employment action in the form of his employment termination in December 2009.

Kraus next must provide evidence of a causal connection between the adverse

action – his December 2009 termination – and his 2007 testimony. *See Lewis v.*

*City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007). To establish a causal link, Kraus

must show that his testimony was "a substantial or motivating factor" in causing his

employment to be terminated. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d

668, 675 (7th Cir. 2011). In other words, to survive summary judgment, Kraus needs to

provide enough evidence to allow a jury to conclude that he was terminated because of

his statutorily protected testimony.

Kraus has not pointed to any direct or circumstantial evidence of a causal

connection between his EEO testimony in 2007 and his employment termination.[11] The

undisputed facts do not reasonably suggest that Kraus's EEO testimony in 2007 was a

"substantial or motivating factor" behind his discharge. *Id.* Kraus argues that Kraus's

employment termination came in "close proximity in time" to Kraus's last request for

reassignment and his 2007 testimony. However, more than two years passed between

Kraus's 2007 testimony in Holt's case and his employment termination. "When an

employee's protected conduct is separated by a significant period of time from the

adverse employment action, the proximity of the incidents does not support a causal

connection between them." *Id.* Even setting aside the temporal gap between his

protected activity and his employment retaliation, Kraus presents no other evidence that

---

[11] The VA argues that Kraus has not submitted any direct evidence to support his Title VII retaliation claim; but Kraus may also prove his claim with circumstantial evidence. *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008) (*Atanus*) ("'Direct' proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion . . . but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences.").

his employment termination was in retaliation of his 2007 testimony. Therefore, there is no "longer chain of inferences" upon which a reasonable juror could believe that Kraus's 2007 testimony in Holt's case was a substantial or motivating factor in Kraus's termination. *See Atanus*, 520 F.3d at 672; *see also Hughes v. Derwinski*, 967 F.2d 1168 (7th Cir. 1992) (affirming the district court's grant of summary judgment, stating that a four-month time lag between the filing of a complaint and the alleged retaliation, standing by itself, was insufficient to prove the required causal connection); *see also Roger Whitmore's Auto., Servs., Inc.*, 424 F.3d 659 (7th Cir. 2005) (finding, on summary judgment, that fourteen months between the constitutionally protected right and the alleged retaliation was too long to establish a causal connection).

The VA's Motion for Summary Judgment is granted as to Count III.

## CONCLUSION

For the reasons set forth above, the VA's Motion for Summary Judgment [11] is denied as to Counts I and II and is granted as to Count III.

Date: _January 11, 2012_          _____
                                  JOHN W. DARRAH
                                  United States District Court Judge